STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Michael J. KURZAWA, Defendant-Appellant.†

Supreme Court

*No. 92–0926–CR.  Oral argument October 19, 1993.—Decided January 12, 1994.*

(Also reported in 509 N.W.2d 712.)

503

For the plaintiff-respondent-petitioner the cause was argued by *Sharon Ruhly,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there were briefs by *Stephen M. Glynn, Robert R. Henak* and *Shellow, Shellow & Glynn, S.C.,* Milwaukee and oral argument by *Robert R. Henak.*

JON P. WILCOX, J.   This is a review under sec. (Rule) 809.62, Stats., of a published decision of the court of appeals[1] reversing Walworth County Circuit Court Judge James L. Carlson's determination that the state's attempt to prosecute the defendant, Michael J. Kurzawa (Kurzawa) in Walworth County on 54 counts of forgery did not violate Kurzawa's constitutional protection against being placed twice in jeopardy for the same offense. Because we believe the Walworth County prosecution does not violate Kurzawa's constitutional rights, we reverse and remand.

## *Background*

This appeal has a complicated and lengthy history. In 1977, Dr. Robert Beckes and his wife, Dr. Clarice Beckes, each established their own medical practice in the city of Milwaukee. Beginning in 1977, and continuing until some time in 1986, Kurzawa provided professional services in connection with the business aspects of the Beckes' practices. He was instrumental in the initial set-up of the offices. He also provided ongoing assistance in such areas as personnel decisions, the development of marketing strategies, bill-

---

[1] *State v. Kurzawa,* 173 Wis. 2d 769, 496 N.W.2d 695 (Ct. App. 1993).

paying, and general bookkeeping responsibilities. The performance of these services allowed Kurzawa access to the Beckes' business checking accounts and bank records.

All of the criminal charges against Kurzawa, first in Milwaukee County, and later in Walworth County, stem from allegations that during this period he signed and made payable to himself checks drawn against the Beckes' business checking accounts. These checks were discovered during the course of an audit requested by Robert Beckes in 1986 after he had grown concerned over his practice's financial condition.

That audit revealed that Kurzawa had signed the name of either Robert or Clarice Beckes on checks drawn against their business accounts with the Greater Milwaukee Bank. Many of these checks were payable to parties other than Kurzawa, and apparently went towards legitimate business expenses. In other instances, however, Kurzawa signed checks made payable either to himself or his business. The Beckes claim that Kurzawa was not entitled to those assets. It is conceded by all parties that Kurzawa was not authorized to sign checks on these accounts.

Following an investigation by the forgery unit of the Milwaukee Police Department, Kurzawa was charged in Milwaukee County with one count of embezzlement, contrary to secs. 943.20(1)(b) and (3)(c), Stats. Shortly before trial, the criminal information was amended so as to charge Kurzawa with two counts of theft by fraud, where the value of the property exceeds $2,500, in violation of secs. 943.20(1)(d) and (3)(c). Count one of the amended information involved the property of Dr. Robert Beckes; count two involved the property of Dr. Clarice Beckes.

The theft by fraud charges against Kurzawa went to trial on September 25, 1990. Following the state's

presentation of its case-in-chief, Judge William D. Gardner granted Kurzawa's motion for acquittal on all charges. Judge Gardner based his order on what he regarded as several flaws in the prosecution's legal theory of the case.[2] The merits of the case did not go to the jury.

Then, by criminal complaint dated April 10, 1991, Kurzawa was charged in Walworth County with 54 counts of uttering a forged writing (forgery), in violation of sec. 943.38(2), Stats. Each count arises from a separate check written on the business account of either Robert or Clarice Beckes. The 54 checks in question were written during a time that spanned April 16, 1985 to March 24, 1986. There is no question but that these 54 checks were among those checks that served as the basis for the prior Milwaukee County theft by fraud prosecution.

On October 18, 1991, Kurzawa moved the Walworth County Circuit Court to dismiss the charges against him on double jeopardy grounds. Essentially, his argument was that under the analysis articulated in *Grady v. Corbin,* 495 U.S. 508, (1990), he had already been prosecuted for this offense in the Milwaukee County theft by fraud trial. Judge Carlson

---

[2] Specifically, the Wisconsin theft by fraud statute, sec. 943.20(1)(d), Stats., requires that a false representation be made either to the owner of the property or the owner's agent. Wis. J I—Criminal 1453. The state attempted to prove that Kurzawa's false representations were made to the Beckes' financial institution, the Greater Milwaukee Bank. Judge Gardner determined that the relationship between depositor and financial institution is one of creditor/debtor, not principal/agent. Therefore, the state failed to prove an essential element of the crime. Judge Gardner's analysis in this respect is not a subject of this appeal.

dismissed Kurzawa's motion, and ordered the Walworth County prosecution to proceed.

Kurzawa appealed Judge Carlson's non-final order to the court of appeals. Following an unsuccessful attempt to certify the issue to the Wisconsin Supreme Court, the court of appeals reversed Judge Carlson's order, and remanded the case with instructions to dismiss the criminal complaint.

In the court of appeals' view, the Walworth County forgery prosecution failed *Grady's* double jeopardy analysis. The opinion's author, Judge Nettesheim, noted that *Grady* established a new two-step analysis for "successive prosecution" cases such as Kurzawa's. In the first step, the inquiry is whether the second prosecution passes the "same elements" test of *Blockburger v. United States,* 284 U.S. 299 (1932). That test asks whether each offense, "requires proof of a fact which the other does not." *Id.* at 304. Applying that test, the court of appeals compared the statutory elements of theft by fraud, sec. 943.20(1)(d), with those of forgery, sec. 943.38(2), and found that they survived *Blockburger* because, "they neither have identical statutory elements, nor is one the lesser-included of the other." *Kurzawa,* 173 Wis. 2d at 775.

The court then proceeded to the second inquiry under *Grady,* one it characterized as whether, "to establish an essential element of an offense charged . . . the state will attempt to prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 776. In its analysis, the court of appeals had the benefit of a series of stipulations made by the parties. In one such stipulation, the state acknowledged that in the Milwaukee County prosecution, it sought to establish the element of 'false representation' by proving that Kurzawa obtained money from the Beckes' accounts by forging their

507

names as the purported makers of the checks and naming himself as payee. The court then compared that fact with the following stipulations regarding the conduct the state intended to rely upon in the Walworth County forgery prosecution:

1) Between a date prior to May, 1983 and the end of March, 1986, Mr. Kurzawa wrote a number of checks to himself or his business on the Beckes' business accounts, forging their names as the drawers of the checks. These checks included the checks which are set forth in Counts 1 through 54 of this information.

2) Mr. Kurzawa presented the checks set forth in Counts 1 through 54 of the information for cashing or deposit into accounts held in his name at the Walworth State Bank in Walworth County, Wisconsin.

3) Neither Dr. Robert Beckes nor Dr. Clarice Beckes gave the defendant permission to make the checks, to sign their names to the checks, or to present the checks for cashing anywhere. *Id.*

The court of appeals found that these stipulations revealed that the state was attempting to prosecute Kurzawa for the same "core conduct" in successive prosecutions. This, the court concluded, was precisely what *Grady* forbids. *Id.*

Judge Nettesheim also wrote a separate concurrence wherein he questioned the continuing vitality of *Grady,* particularly in light of the Supreme Court's subsequent holding in *United States v. Felix,* — U.S. —, 112 S. Ct. 1377 (1992), and the Wisconsin Supreme Court's post-*Grady* decision, *State v. Sauceda,* 168 Wis. 2d 486, 485 N.W.2d 1 (1992). *Kurzawa,* 173 Wis. 2d at 777, 778–79 (Nettesheim, J., concurring). Judge Nettesheim recognized that *Sauceda* dealt with the situation where multiple offenses are tried in a single prosecution, while *Grady* was addressed to instances of successive prosecutions. Nonetheless, he felt that

*Sauceda,* which relied almost exclusively on a *Blockburger* analysis, and *Grady* could lead to unjustifiably disparate results. *Id.* at 780.

In April of 1993, we agreed to hear the state's appeal of the court of appeals decision, and scheduled oral arguments for September of that year. In the interim, on June 28, 1993, the United States Supreme Court overturned its barely three-year-old *Grady* decision in *United States v. Dixon,* — U.S. —, 125 L. Ed. 2d 556 (1993). In *Dixon,* five justices criticized *Grady* for what they viewed as that decision's lack of historical grounding and its demonstrated unworkability in practice. *Id.* at 573–76. These same five justices further rejected the idea, which lay at the heart of *Grady,* that the double jeopardy clause required a different method of analysis for cases involving successive prosecutions than it did for multiple punishment cases. *Id.* at 573. The *Dixon* majority returned to *Blockburger's* "same elements" test for virtually all double jeopardy questions. *Id.*

Kurzawa concedes that under *Blockburger,* the Walworth County forgery prosecution can proceed. Still, he advances three arguments why *Blockburger* should not be the test for his double jeopardy claims. First, he maintains that *Dixon,* and its return to *Blockburger's* "same elements" test cannot be retroactively applied to his case because such an application violates ex post facto principles embodied in the Due Process Clause. Second, he argues that even if *Dixon* can be applied without violating due process, this court should nonetheless reject its approach. He insists that *Dixon* was wrongly decided, and that we should adopt a *Grady*-like "same conduct" double jeopardy approach in successive prosecution cases. Finally, he argues that under Supreme Court precedent predating both *Grady* and *Dixon,* his Walworth County prosecution is barred

509

on double jeopardy grounds. We discuss each of these arguments in turn.

## I.

Kurzawa's first argument is that retroactive application of *Dixon's* double jeopardy analysis to his case violates the ex post facto protections embodied in the Due Process Clause. His reasoning is that at the time of his Milwaukee County prosecution, *Grady,* decided on May 29, 1990, was the prevailing law of double jeopardy. According to Kurzawa, the state cannot, consistent with *Grady,* prosecute him for that "same conduct" again in Walworth County. In other words, Kurzawa believes that as of the date of his Milwaukee County acquittal, *Grady* provided him with a double jeopardy defense to the Walworth County forgery charges. He concedes that such a defense does not exist under *Dixon.* As a result, *Dixon,* if applied retroactively, exposes him to punishment from which he was previously immune. Such an "after the fact" increase in punishment, he believes, violates ex post facto principles.

The state, for its part, gives short shrift to Kurzawa's ex post facto arguments. It maintains that under *Griffith v. Kentucky,* 479 U.S. 314 (1987), new rules with respect to criminal prosecutions can always be applied retroactively to cases in the direct appeal "pipeline." In this case, the "new rule" is *Dixon's* return to the double jeopardy analysis of *Blockburger.* Because this new rule was announced while Kurzawa's case was in the "pipeline", it can automatically be applied to Kurzawa.

[1]

We begin by noting that the principles underlying the Ex Post Facto Clause apply to judicial pronounce-

510

ments as well as to legislative acts. As the Supreme Court has stated:

> The ex post facto clause is a limitation upon the powers of the legislature . . . and does not on its own force apply to the Judicial Branch of Government. But the principle on which the clause is based-the notion that persons have a right to have fair warning of that conduct which will give rise to criminal penalties-is fundamental to our concept of constitutional liberty. As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.

*Marks v. United States,* 430 U.S. 188, 191-192 (1977). *See also, Bouie v. City of Columbia,* 378 U.S. 347 (1964). Accordingly, our task is to determine whether the application of *Dixon's* analysis in this case violates ex post facto principles, thereby depriving Kurzawa of due process.

The United States Supreme Court has on various occasions articulated the protections afforded by the Ex Post Facto Clause:

> It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

*Beazell v. Ohio,* 269 U.S. 167, 169–170 (1925). *See also, Collins v. Youngblood,* 497 U.S. 37, 42 (1990).

The Supreme Court's discussion in *Marks* illustrates these principles. The *Marks* defendants faced charges arising from their transport of allegedly

511

obscene materials. This conduct continued through February 27, 1973. *Marks,* 430 U.S. at 189–190. Their trial was set for the following October. On June 21, 1973, the United States Supreme Court decided *Miller v. California,* 413 U.S. 15 (1973). In *Miller,* the court adopted a broader definition of obscenity than that which it had espoused earlier in *Memoirs v. Massachusetts,* 383 U.S. 413 (1966). The issue in *Marks* centered on which definition of obscenity should be applied: the *Memoirs* standard, or the more inclusive *Miller* standard.

The Supreme Court held that the *Marks* defendants could not, consistent with due process, be prosecuted under the new, tougher *Miller* standard. *Marks,* 430 U.S. at 196. The reason was that at the time they engaged in their allegedly illegal behavior, *Memoirs,* not *Miller,* was the law. Because the new *Miller* standard criminalized conduct that was innocent when committed, it could not be retroactively applied to those defendants. *Id.*

*Marks* also reveals why the state's reliance on *Griffith's* "pipeline" theory of retroactivity can be misplaced when ex post facto concerns are raised. In *Marks,* the new rule at issue, the broader *Miller* obscenity standard, was announced while the case was in the direct appeal "pipeline". Nevertheless, the Supreme Court held that applying that new standard retroactively violated the defendants' due process rights. This reasoning conflicts with the state's expansive application of *Griffith* to ex post facto analysis.

When a criminal defendant raises Ex Post Facto Clause concerns with respect to the application of new law, courts must look to see whether the application violates one or more of that clause's recognized protections. Specifically, the court must determine whether

512

the new law criminalizes conduct that was innocent when committed, increases the penalty for conduct after its commission, or removes a defense that was available at the time the act was committed. *Collins,* 497 U.S. at 52. Only when these protections are not violated does *Griffith* allow retroactive application.

Kurzawa claims that retroactive application of *Dixon* violates the ex post facto protection against increased punishment because under the double jeopardy analysis of *Grady,* he could not have been prosecuted in Walworth County for the "same conduct." Kurzawa's argument ignores one of the fundamental aspects of ex post facto analysis, that being its focus on changes in the law relative to the time of the defendant's allegedly illegal behavior. That focus arises from the clause's animating principle, namely that "persons have a right to fair warning of that conduct which will give rise to criminal penalties. . . ." *Marks,* 430 U.S. at 192. This principle, "fundamental to our concept of constitutional liberty", *Id.,* is premised on the right to know how to conform one's conduct to the law, and the consequences of not doing so, at the time one engages in that conduct.[3] This explains why ex post facto analysis is concerned with changes in the law relative to the time the defendant engaged in his allegedly illegal behavior.

It also explains why Kurzawa's reliance on *Grady* itself is misplaced. The conduct for which Kurzawa

[3] It is accepted as an axiom of American constitutional law that failure to give a defendant fair warning of the consequences of his conduct, when such conduct is determined to be unlawful only after the fact, provides a constitutional defense. *Waukesha Memorial Hospital v. Baird,* 45 Wis. 2d 629, 636, 173 N.W.2d 700 (1970).

faces prosecution in Walworth County occurred no later than March of 1986. *Grady* was not decided until May of 1990, more than four years later. *Dixon's* rejection of *Grady* in and of itself cannot support an ex post facto clause defense.[4]

The real question with respect to Kurzawa's due process/ex post facto arguments is whether *Dixon* exposes him to a prosecution, and therefore punishment, from which he would have been free under the law as it existed at the time of his alleged acts, or whether it merely restored double jeopardy analysis to the state that existed at that time. Our examination of Supreme Court precedent in this area leads us to believe that the latter is true. As a result, we reject those arguments.[5]

---

[4] Kurzawa's reliance on *Rubino v. Lynaugh,* 845 F.2d 1266 (5th Cir. 1988), is similarly unavailing. In *Rubino,* the new judicial interpretation removed a defense that had been available to the defendant when he allegedly committed his offenses. *Id.* at 1268.

[5] We note that *Collins,* decided in 1990, casts considerable doubt as to whether, in future cases, changes in the law of double jeopardy will in any event support an ex post facto argument. In *Collins,* the Supreme Court appeared to confine ex post facto violations to "alterations in 'the legal definition of the offense' or 'the nature or amount of the punishment imposed for its commission.' " *Collins,* 497 U.S. 37, 50, *quoting Beazell,* 269 U.S. at 169–170. Prior to *Collins,* the ex post facto clause apparently embraced any change which "altered the situation of a party to his disadvantage." *Collins,* 497 U.S. at 50. We need not decide whether changes in double jeopardy law qualify under either of these standards because our decision today is based on the determination that *Dixon* merely places Kurzawa in the position he faced when he engaged in his suspect activity. "It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." *Miller v. Florida,* 482 U.S. 423, 431 (1987).

The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The clause has been construed to encompass three separate constitutional protections:

> It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishment for the same offense.

*North Carolina v. Pearce,* 395 U.S. 711, 717 (1969). We will refer to the first two of these as protections against "successive prosecutions" and the third as protection from "multiple punishments."

There can be no dispute that in cases involving multiple punishments in a single prosecution, *Blockburger's* "same elements" test is the accepted method for determining which offenses are the same for double jeopardy clause purposes. *See, Sauceda,* 168 Wis. 2d at 489. Under *Blockburger,* the inquiry is whether each offense contains a statutory element not contained in the other; if not, they are the same for double jeopardy purposes and multiple punishments are prohibited. *Blockburger,* 284 U.S. at 304.

The task before the court in *Grady* and *Dixon,* though, was to define the appropriate double jeopardy analysis for cases such as Kurzawa's that involve successive prosecutions. In *Dixon,* five justices, led by Justice Scalia, held that *Blockburger* was the correct

---

Last term, in *State v. Koch,* 175 Wis. 2d 684, 499 N.W.2d 152 (1993), we relied on *Griffith* to retroactively apply the new "48-hour" rule announced in *County of Riverside v. McLaughlin,* — U.S. —, 111 S. Ct. 1661 (1991). Such reliance was proper in that case because retroactive application of that new rule did not violate any ex post facto protections.

analysis in such cases. These justices believed that *Grady 's* "same conduct" approach was "wholly inconsistent with earlier Supreme Court precedent . . ." and that "there is *no* authority except *Grady* for the proposition that it [the term 'same offense'] has different meanings in the two contexts." *Dixon,* — U.S. —, 125 L. Ed. 2d. at 573 (emphasis in original).

We agree that prior to *Grady, Blockburger 's* "same elements" test was the prevailing law for all double jeopardy claims, including those involving successive prosecutions. As a result, *Dixon 's* return to *Blockburger* merely places Kurzawa in precisely the same position he faced when he engaged in the conduct at issue. A review of the cases relied upon by *Grady* to support its two-step "same conduct" approach confirms our view. With one possible exception, none of those cases provide any direct support for *Grady.* Rather, they all rely on a *Blockburger*-type analysis.

In *Brown v. Ohio,* 432 U.S. 161 (1977), the Supreme Court held that a defendant who had already been convicted for "joyriding" could not subsequently be prosecuted for auto theft. Under Ohio law, conviction for joyriding required proof that the defendant did "purposely take, operate, or keep any motor vehicle without the consent of the owner." *Id.* at 162 n.1. The auto theft statute, on the other hand, simply stated that, "No person shall steal any motor vehicle." *Id.* at 163 n.2. There was no dispute that the two prosecutions arose from the same conduct. Citing the Ohio Court of Appeals' determination that joyriding was a lesser-included offense of auto theft, the Supreme Court held that the auto theft prosecution violated

double jeopardy. In so doing, the Court relied strictly on a *Blockburger* "same elements" test. *Id.* at 168.[6]

*Grady* also tried to draw support for its "same conduct" from the holding in *Ashe v. Swenson,* 397 U.S. 436 (1970). In *Ashe,* the jury at the initial trial found that the defendant was not one of the robbers participating in the hold-up of a poker game. The Supreme Court held that resolution of that issue to the defendant's benefit in the first trial estopped the state from relitigating that same issue at a second trial involving a different victim of that same robbery. *Id.* at 445. The court's decision in *Ashe* was grounded in the law of collateral estoppel as applied to previously litigated facts. As such, *Ashe* provides little if any support to *Grady's* double jeopardy approach, especially in cases such as Kurzawa's where the merits of the case never reached the jury.[7]

---

[6] In *Grady,* Justice Brennan's majority opinion cites language contained in a *Brown* footnote (*Brown,* 432 U.S. at 166–67 n.6), to support the argument that something other than *Blockburger* is required in successive prosecution cases. *Grady,* 495 U.S. at 519. We do not find Justice Brennan's reliance on that footnote persuasive in that it is pure dictum, and does nothing to alter the fact that in *Brown,* a case involving successive prosecutions arising from the same conduct, the court applied a *Blockburger*-type analysis.

[7] Although *Ashe* did conclude that collateral estoppel principles were embodied in the Double Jeopardy Clause, *Ashe,* 397 U.S. at 445, the decision's focus on collateral estoppel rather than double jeopardy is revealed in the opinion's following observation:

> The question is not whether Missouri could validly charge the petitioner with six separate offenses for the robbery of six poker players. It is not whether he could have received a total of six punishments if he had been convicted in a single trial of robbing the six victims. It is simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers, the State

A third case relied upon by *Grady* is *Harris v. Oklahoma,* 433 U.S. 682 (1977). In *Harris,* the defendant was convicted of felony murder in connection with the robbery of a grocery store. The Oklahoma Court of Criminal Appeals determined that proof of the underlying felony, armed robbery, was necessary to prove the requisite intent for felony murder. *Id.* at 682. In a brief per curiam decision, the Supreme Court held that Harris's subsequent prosecution for the underlying felony of armed robbery was barred by the Double Jeopardy Clause. *Id.*

In *Dixon,* Justice Scalia maintained that *Harris* is completely consistent with a *Blockburger* analysis because the underlying substantive offense was actually just a lesser-included offense of the greater crime. *Dixon,* — U.S. —, 125 L. Ed. 2d at 574–75. In other words, felony murder could not have been proved without also proving the lesser crime, armed robbery. We agree with that analysis, and with the conclusion that *Harris* reflects a *Blockburger*-type analysis.

*Illinois v. Vitale,* 447 U.S. 410 (1980), represents another successive prosecution case where the Supreme Court applied a *Blockburger* analysis. The defendant in *Vitale* was first convicted for failure to reduce speed in connection with his role in an auto accident. *Id.* at 412. Later, the state charged him with involuntary manslaughter with a motor vehicle, proof of which requires "reckless operation of a motor vehicle." *Id.* at 416–17. The Illinois Supreme Court, relying on *Brown,* held that failure to reduce speed was a lesser-included offense of involuntary manslaughter because the recklessness element of involuntary man-

---

could constitutionally hale him before a new jury to litigate that issue again. *Id.* at 446.

slaughter could be established by proving a reckless failure to reduce speed. *Id.* at 417.

The United States Supreme Court reversed. Applying a very strict *Blockburger* analysis, the court focused exclusively on the statutory elements of the two offenses, and determined that because it was possible to prove involuntary manslaughter without proving a failure to reduce speed, the latter was not a lesser-included of the former. *Id.* at 418–19. The court distinguished *Brown* on the grounds that in that case, "the prosecutor who had established auto theft necessarily has established joyriding as well." *Id.* at 417.

The majority opinion in *Grady* ignored that fact. Instead, it focused on *Vitale's* suggestion that if, in the involuntary manslaughter prosecution, the state in fact relied on the failure to reduce speed to prove the recklessness element of involuntary manslaughter, the defendant would have a "substantial" double jeopardy argument. *Grady,* 495 U.S. at 515–16. Again, we believe *Grady* makes too much of this dicta. As Justice Scalia pointed out in *Dixon,* the suggestion in *Vitale* does not say that the defendant would have a "winning" argument should that occur, only that he would have a substantial one. *Dixon,* — U.S. —, 125 L. Ed. 2d at 575.

In fact, the only case relied on by *Grady* that may illustrate the application of something other than a *Blockburger* analysis is the nineteenth century case, *In re Nielsen,* 131 U.S. 176 (1889). In *Nielsen,* the defendant was first convicted of unlawful cohabitation with two women, and then convicted of adultery with one of the women the following day. *Id.* at 185. The Supreme Court granted defendant's petition for habeas corpus relief on the grounds that the adultery prosecution violated the double jeopardy clause.

It is not clear exactly what analysis the *Nielsen* court applied to that defendant's double jeopardy

claim.[8] In any event, we believe *Nielsen* is exceedingly weak authority for *Grady's* "same conduct" approach. First, we note the opinion's obvious age and lack of clarity. Second, we are aware of at least one double jeopardy case from roughly the same period, also involving successive prosecutions arising from the same conduct, where the Supreme Court relied solely on a *Blockburger*-type analysis without even mentioning *Nielsen. Gavieres v. United States,* 220 U.S. 338 (1911).[9]

---

[8] Five justices in *Grady* maintained that the prosecutions for adultery and unlawful cohabitation each required proof the other did not. *See, Grady,* 495 U.S. at 519. Apparently, they believed that unlawful cohabitation required proof of cohabiting with two or more women while adultery did not, and that adultery required proof of marriage while unlawful cohabitation did not.

In *Dixon,* five justices believed that *Nielsen* was consistent with a *Blockburger* analysis, and that the court in *Nielsen* barred the adultery prosecution only after it determined that adultery was simply a lesser-included offense of unlawful cohabitation. *Dixon,* — U.S. —, 125 L. Ed. 2d at 573–74.

Commentators have remarked on *Nielsen's* lack of clarity in this respect. *See, e.g.,* Eli J. Richardson, *Matching Tests for Double Jeopardy Violations with Constitutional Interests,* 45 Vand. L. Rev. 273, 295 n.155 (concluding that, "in fact, it is difficult to determine the exact basis for *Nielsen*").

[9] In *Gavieres,* the Supreme Court cited with approval the following language from an earlier Massachusetts case, *Morey v. Commonwealth,* 108 Mass. 433 (1871):

> The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment from the other. *Gavieres,* 220 U.S. at 342.

Finally, we note that in *State v. Brooks,* 215 Wis. 134, 254 N.W. 374 (1934), this court specifically limited *Nielsen* to its "peculiar circumstances", and applied a strict "same elements" test to the state's attempt at successive prosecutions. *Id.* at 139. In *Brooks,* the question was whether the defendant's prior conviction for lewd and lascivious behavior barred a subsequent prosecution for adultery. The court determined that the offenses were not the same for double jeopardy purposes because, "there are distinct elements in one which are not included in the other, though both relate to one transaction." *Id.* at 140.

To summarize, dictum in several Supreme Court cases prior to *Grady* does express the sentiment that an approach other than *Blockburger* is required when successive prosecutions are attempted. We nonetheless agree with *Dixon's* conclusion that prior to *Grady, Blockburger* was the law for determining which offenses were the same in such cases.[10] In fact, *Grady*

[10] A number of commentators agree with our conclusion that *Grady* represented a significant break with past Supreme Court precedent. See, e.g., Craig J. Webre, *Grady v. Corbin: Successive Prosecutions Must Survive Heightened Double Jeopardy Protection,* 36 Loy. L. Rev. 1171, 1182 (1991) ([*Grady*] is significant in that it alters nearly sixty years of established precedent."); Diane M. Resch, *"High Comedy but Inferior Justice": The Aftermath of Grady v. Corbin,* 75 Marq. L. Rev. 265, 273 (1991) ("The rule of law articulated in *Grady v. Corbin* is a dramatic expansion of the *Blockburger* test."); Eli J. Richardson, *Matching Double Jeopardy Violations with Constitutional Interests,* 45 Vand. L. Rev. 273, 296 (1991) (concludes that *Grady* is unsupported by earlier Supreme Court precedent); Sara Barton, *Grady v. Corbin: An Unsuccessful Attempt To Define 'Same Offense,'* 25 Ga. L. Rev. 143, 155 (1990) (observes that not until *Grady* did Justice Brennan succeed in removing

itself seems to recognize this distinction between sentiment and law when it speaks of adopting the "suggestion" set forth in *Vitale* dicta. *Grady,* 495 U.S. at 510. Accordingly, we believe that at the time Kurzawa engaged in the conduct for which he stands accused, *Blockburger's* "same elements" test was the standard by which his double jeopardy claim would have been analyzed. We conclude, therefore, that applying such an analysis now does not violate his due process rights.

## II.

Kurzawa next argues that irrespective of ex post facto considerations, this court should reject *Dixon* because it was wrongly decided. Kurzawa urges us, rather, to interpret the Wisconsin Constitution's Double Jeopardy Clause so as to provide broader protections for defendants such as himself that face successive prosecutions.

Kurzawa's arguments with respect to the wisdom of *Dixon* virtually mirror those advanced by Justice Brennan in *Grady,* and Justice Souter in his *Dixon* dissent. *Dixon,* — U.S. —, 125 L. Ed. 2d 556, 598 (Souter, J., dissenting.) We see little need to reiterate those arguments, or for that matter, the counter arguments championed by Justice Scalia in both those cases.

Generally, this court's construction of Wisconsin's prohibition against double jeopardy is guided by the rulings of the United States Supreme Court. *State v. Barthels,* 174 Wis. 2d 173, 181, 495 N.W.2d 341 (1993). We believe that *Grady,* and its "same conduct" approach to double jeopardy analysis, is a poor candi-

---

*Blockburger's* "almost exclusive hold over the definition of 'same offense' ").

date for persuading us to deviate from that course. During its brief life span, *Grady* was heavily criticized for being unsupported by precedent, for allowing unjust results,[11] and for proving unworkable in practice.[12] To this list, we would add *Grady*'s infidelity to the language of the Double Jeopardy Clause itself,

[11] This criticism generally arises in light of the outcome in *Grady* itself. In *Grady,* the defendant, while intoxicated, drove his vehicle across the center line, striking two oncoming vehicles, killing one of the drivers. *Grady,* 495 U.S. at 511. He was charged and pled guilty to two misdemeanor traffic tickets, one for crossing the center line, and the other for driving while intoxicated. *Id.* at 512–13. Subsequently, the state attempted to prosecute him for criminally-negligent homicide. Attendant to that prosecution the state submitted a bill of particulars that said it intended to rely on the traffic offenses to prove the homicide charges. *Id.* at 514–15. The Supreme Court held that the homicide prosecution violated the Double Jeopardy Clause because, "the State has admitted that it will prove the entirety of the conduct for which Corbin was convicted-driving while intoxicated and failing to keep right of the median-to establish essential elements of the homicide and assault charges." *Id.* at 523.

[12] See, *United States v. Felix,* — U.S. —, 112 S. Ct. 1377, 1383–84 (1992), wherein the Supreme Court was forced to back away from a "literal" reading of *Grady,* "because of difficulties which have already arisen in its interpretation."

See also, Craig J. Webre, *Grady v. Corbin: Successive Prosecutions Must Survive Heightened Double Jeopardy Protection,* 36 Loy. L. Rev. 1171, 1185 (1991) ("Certainty, simplicity, and justice could have been achieved by retaining the traditional *Blockburger* test as the exclusive means of defining the 'same offense' in successive prosecutions. . . ."); *and,* Diane M. Resch, *"High Comedy but Inferior Justice": The Aftermath of Grady v. Corbin,* 75 Marq. L. Rev. 265, 281 (1991) ("Historically, the *Blockburger* test has served as an objective and practical framework by which to determine whether the Double Jeopardy Clause bars a subsequent prosecution. Whatever shortcomings

which prohibits successive prosecutions of the "same offense," not the "same conduct," as another reason not to adopt its methodology.[13]

We believe that *Blockburger,* and the case law developed around it, adequately protect the interests embodied in the Double Jeopardy Clause. Under *Blockburger,* the state cannot successively prosecute a defendant for two offenses unless each offense necessarily requires proof of an element the other does not. Neither can the state prosecute an offense whose elements are "incorporated" into the elements of an offense already prosecuted. *Dixon,* — U.S. —, 125 L. Ed. 2d at 569. Finally, the state cannot relitigate factual issues that have already been adjudicated to the defendant's benefit in an earlier prosecution. *Ashe,* 397 U.S. at 446. These protections ensure that defendants will not be forced to unfairly "run the gauntlet" a second time for the same offense.

Of course, we recognize that the Double Jeopardy Clause's prohibition against "successive prosecutions" protects different interests than does its prohibition against "multiple punishments."[14] Still, we do not believe that these different interests necessarily

the *Blockburger* test may have had, *Grady v. Corbin* does not remedy them.").

[13] Kurzawa also argues that we should construe the Double Jeopardy Clause of the Wisconsin constitution more broadly than its federal counterpart based on the Preamble to our state constitution, which, he argues, evinces a greater emphasis on "the blessings of freedom" than it does on the "general welfare." Without deciding the precise merits of Kurzawa's constitutional analysis, we reject his reasoning because our holding today does nothing to jeopardize the "blessings of freedom" ensured the citizens of this state.

[14] In *Grady,* Justice Brennan argued that the interests underlying the Double Jeopardy Clause's protection against

require or even recommend separate analyses. *Block-burger's* emphasis on statutory elements is simple and objective. It provides defendants, courts, and prosecutors certainty as to which offenses are the same for double jeopardy purposes. Moreover, it is the approach that best comports with the language of the double jeopardy clause. *Blockburger* is not a perfect test, but it is better than *Grady's* "same conduct" approach. We hereby follow the United States Supreme Court and adopt the analysis of *Dixon* and *Blockburger* in double jeopardy cases involving successive prosecutions.

Under a *Blockburger* "same elements" test, theft by fraud, sec. 943.20(1)(d), Stats., and uttering a forged writing, sec. 943.38(2), are different offenses, and can be prosecuted in separate prosecutions. Kurzawa does not dispute that fact. Comparing the statutory elements of the two offenses, it is clear that each requires proof of an element or elements which the other does not.[15] Most significantly, theft by fraud requires proof that the defendant intended to deceive and defraud the

successive prosecutions went beyond that Clause's protection against multiple punishments:

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.

*Grady* 495 U.S. at 518, quoting *Green v. United States,* 355 U.S. 184, 187 (1957).

Justice Brennan also noted that successive prosecutions, "give the State an opportunity to rehearse its proof, thus increasing the risk of an erroneous conviction . . . ." *Id.*

[15] The statutory elements of theft by fraud, sec. 943.20(1)(d), Stats., are:

owner, and that the owner was in fact deceived and defrauded. Forgery does not. Forgery requires proof that the defendant forged a writing, and that the writing was one "by which legal rights or obligations are created or transferred." Theft by fraud does not. Since the two offenses each require proof of an element the other does not, they survive *Blockburger* analysis, and they can be prosecuted separately.

## III.

In his final argument, Kurzawa seeks to characterize the Walworth County forgery prosecution as falling under the "incorporation" species of lesser-included offenses, exemplified by the pre-*Grady* case, *Harris.*

---

First, that the defendant made a false representation to the owner of the property.

Second, that the defendant knew that such representation was false

Third, that the defendant made such representation with intent to deceive and to defraud the owner of the property.

Fourth, that the defendant obtained title to the property of the owner by such false representation.

Fifth, that the owner of the property was deceived by such representation.

Sixth, that the owner of the property was defrauded by such representation.

Wis. J I—Criminal 1453.

The statutory elements of uttering a forged writing under sec. 943.38(2), Stats., are:

First, that the writing was one by which legal rights or obligations are created or transferred.

Second, that the writing was falsely made.

Third, that the defendant uttered the writing as genuine.

Fourth, that the defendant knew the writing was falsely made.

Wis. J I—Criminal 1492.

We do not agree with Kurzawa's arguments in that regard. The Supreme Court has made clear that its holding in *Harris* was premised on the fact that a conviction for the "greater offense" in that case, felony murder, necessarily required proof of all the elements of the "lesser offense," armed robbery. *Dixon,* — U.S. —, 125 L. Ed. 2d at 574. In other words, the statutory definition of felony murder "incorporated" the underlying offense of armed robbery. This led the court to conclude that for double jeopardy purposes, felony murder was not a "separate offense distinct from its various elements." *Vitale,* 447 U.S. at 420.[16]

That is not the case with these offenses. As shown above, a theft by fraud conviction does not necessarily require proof of all the elements of forgery. In that regard, Kurzawa's case is more analogous to the situation in *Vitale,* where the court allowed the prosecution for involuntary vehicular manslaughter because that offense did not always require proof of failure to reduce speed, the offense for which Vitale had previously been convicted. *Id.* at 419. It is true that in *Vitale,* the court "suggested" that the state's reliance on Vitale's failure to reduce speed to prove involuntary manslaughter

[16] In *Dixon,* Justice Scalia and Justice Kennedy applied a similar "incorporation" analysis to bar several prosecutions in that case. This is illustrated in their approach to defendant Dixon's double jeopardy claims. As a condition of his release pending his murder trial, Dixon was warned that "any criminal offense" would subject him to among other things, prosecution for contempt of court. While out on bond, Dixon was arrested for possession of cocaine with intent to deliver. As a result, he was found guilty of criminal contempt. Justices Scalia and Kennedy would have barred his prosecution on the cocaine charges because the drug offense "did not include any element not contained in his previous contempt offense. . . ." *Dixon,* 125 L. Ed. 2d at 570.

would give Vitale a "substantial" double jeopardy argument. *Id.* at 421. In *Dixon,* the Supreme Court overruled *Grady* and decided that that "substantial" claim was not a winning claim. So it is with Kurzawa's double jeopardy arguments. We believe that the state's attempt to prosecute Kurzawa in Walworth County does not violate the Double Jeopardy Clause. Accordingly, we reverse the decision of the court of appeals, and remand this case to the circuit court for further proceedings not inconsistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the case is remanded to the circuit court.

SHIRLEY S. ABRAHAMSON, J. *(concurring).* I join the majority opinion because I conclude that it has properly applied the *Blockburger* test endorsed by *United States v. Dixon,* 61 LW 4835 (1993), the United States Supreme Court's most recent pronouncement on double jeopardy.

I write separately because I believe it is time for the court to take a fresh look at double jeopardy. As the justices of the United States Supreme Court have openly acknowledged, federal double jeopardy jurisprudence is in disarray. The double jeopardy clause in the federal constitution has become encrusted with numerous conflicting decisions and interpretations. The 5–4 *Dixon* decision, which overruled a 5–4 decision rendered barely three years earlier,[1] produced five

---

[1] *Grady v. Corbin,* 495 U.S. 508 (1990), was the case overruled.

The majority concludes, as did Justice Scalia in *Dixon,* that *Grady v. Corbin* had no support from prior cases. As long as this court is applying federal constitutional law to this case, I feel bound by Justice Scalia's interpretation adopted by the major-

opinions with the justices joining and rejecting various portions of each other's opinions. When it requires a chart to determine which paragraphs of a United States Supreme Court decision constitute the law of the land, you know you are in trouble.

Rather than commit ourselves to this federal labyrinth, this court and the lawyers who appear before it should return to the words of the Wisconsin Constitution.[2] We must look anew at our state constitution's double jeopardy clause and the nineteenth and early twentieth century decisions interpreting it. We must attempt to fashion a workable application of our double jeopardy clause that remains true to its purposes.

Were framing such a test an easy task, no doubt the United States Supreme Court would have unraveled its snarled jurisprudence long ago. However, state courts cannot abdicate the responsibility for developing a modern approach to double jeopardy. Enforcing constitutional rights is as much the responsibility of state courts as it is the federal courts. After all, the vast majority of criminal prosecutions across the country are brought in state courts using state statutes.

I.

Simply stated, the problem is this: What test for multiple prosecutions will protect the individual from the burden of defense against serial prosecutions for essentially the same conduct without unfairly hampering the state in prosecuting and convicting the guilty?

---

ity's opinion but I think that Justice Souter's analysis of these earlier cases in *Dixon* is more persuasive.

[2] Article I, section 8(1) of the Wisconsin Constitution provides that: ". . . no person for the same offense may be put twice in jeopardy of punishment. . . ." The state and federal constitutional provisions are not identical.

The United States Supreme Court's 1932 *Block-burger* opinion represents one attempt to solve this problem. As the majority opinion explains, the *Block-burger* test attempts to distinguish among offenses by comparing the elements required for proof of each crime. Generally a subsequent prosecution may go forward if it requires proof of an additional element.

Today the *Blockburger* test still serves well as an initial inquiry, but it is not sufficiently refined to cope with the plethora of criminal statutes now crowding the statute books. In this case, for example, the very same forged checks could be used as the basis for prosecutions under at least two state criminal statutes. When the state lost its case under one statute, a second case was brought under another.

It is not unusual in Wisconsin for a prosecutor to have at his or her disposal two, three or even more statutes upon which to base a prosecution. Indeed, the legislature adds new criminal statutes each session, some of them designed to criminalize the specific conduct of a high-profile defendant whose conduct is already punishable under one or more existing criminal statutes. The resulting surfeit of overlapping statutes complicates double jeopardy issues relating to multiple prosecutions. If a meaningful test under Wisconsin's double jeopardy clause is not formulated, the bar to successive prosecutions will be evaded simply because the legislature established numerous offenses, each with a slightly different set of legal elements.

As the people of this country and this state understand the double jeopardy clause, an individual cannot be prosecuted twice for essentially the same conduct. Witness the fact that many people found puzzling and even troubling that the police officers accused of beating Rodney King could be acquitted and then prosecuted a second time.

530

Adherence to the *Blockburger* test today invites the very abuses the double jeopardy clause was designed to protect against. As Justice Souter suggested in *Dixon,* "the government could . . . bring a person to trial again and again for that same conduct, violating the principle of finality, subjecting him repeatedly to all the burdens of trial, rehearsing its prosecutions, and increasing the risk of erroneous conviction, all in contravention of the principles behind the protection from successive prosecution. . . ."[3]

## II.

The perils underlying a technical approach to comparison of offenses under *Blockburger,* and recognition that *Blockburger* does not sufficiently protect defendants from the burdens of multiple trials, led the United States Supreme Court to the "same conduct" test set forth in *Grady v. Corbin,* 495 U.S. 508, 520 (1990).[4] In *Grady* the court added to the *Blockburger* test the requirement that a subsequent prosecution not require

---

[3] *United States v. Dixon,* 61 LW 4835, 4855 (1993) (Souter, J. concurring and dissenting).

[4] The Court has distinguished between multiple punishments in one prosecution and multiple prosecutions. The interests at stake in prohibiting multiple punishments and in avoiding successive prosecutions are different. *United States v. Dixon,* 61 LW 4835, 4851 (1993) (Souter, J. concurring and dissenting).

A prosecutor may bring one lawsuit charging the defendant under several or all of the statutes. On conviction, the defendant may be punished for violation of more than one statute if the legislature intended cumulative punishment. The legislature can impose severe and multiple punishments if it wishes because the legislature determines the penalty for a crime, within the limits of the Eighth Amendment.

proof of conduct that constitutes an offense for which the defendant has already been prosecuted.

However, as the majority notes, *Grady* soon became the target of criticism. Among these criticisms is the valid concern that defendants could be convicted of a misdemeanor in one court, barring prosecution in another court for a felony arising out of the same conduct. Further, some critics contend that the difficulty of defining what constitutes the "same conduct" has rendered the *Grady* test unworkable.

## III.

.In light of the problems with *Blockburger* and the criticisms of *Grady,* a new approach to multiple prosecutions under the Wisconsin constitution should satisfy several important criteria. First, the test must remain true to the principles underlying the double jeopardy clause. It must protect the individual from the continuing anxiety, insecurity, and expense of repeated attempts by the state, with all its resources and power, to obtain a criminal conviction on the basis of the same "offense." Second, the test must produce results that carefully and fairly balance the individual's interest in protection from multiple trials and the public's interest in ascertaining guilt and punishing offenders. Requiring joinder of all charges and prohibiting all serial proceedings does not make sense under all circumstances. For example, under certain circumstances the prosecution should not have to forego more serious charges when less serious charges were initially prosecuted. Third, the test must be usable; prosecutors, defendants and the courts must be able to apply it with relative ease.

I recognize that we are unlikely to find a perfect test for multiple prosecutions under the double jeop-

ardy clause that will fit all cases. I also understand why counsel have not fully developed state constitutional arguments and new approaches to this problem. It is discouraging to expend the time and effort necessary to make state constitutional arguments when this court so often dismisses such claims out of hand. Although our court has in numerous instances recognized its authority to interpret Wisconsin's constitution, it has often adopted federal interpretations of provisions of the Wisconsin constitution without further analysis.

Double jeopardy jurisprudence is an important area of law where state courts have a special responsibility, especially in Wisconsin where the interpretations of the federal constitution do not seem to meet our needs. The application of the fresh thoughts and inspiration of counsel and the academic community to this challenge is welcome.?